IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| CATHY SHATZER, | ) | Civil Case No. 13-233 |
| | ) | |
| Plaintiff, | ) | Judge Kim R. Gibson |
| | ) | |
| v. | ) | |
| | ) | |
| RITE AID CORPORATION and RITE | ) | |
| AID OF PENNSYLVANIA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

### I.   Introduction

Pending before the Court is a motion for summary judgment (ECF No. 28) filed by Defendants Rite Aid Corporation and Rite Aid of Pennsylvania, Inc., with respect to all claims asserted in Plaintiff Cathy Shatzer's amended complaint filed on October 29, 2013. (ECF No. 5). Plaintiff's amended complaint alleges harassment and discrimination based upon gender and disability, and constructive discharge, under the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"). For the reasons that follow, Defendants' motion for summary judgment will be **GRANTED in part** and **DENIED in part**.

### II.   Jurisdiction and Venue

The Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343. Venue is proper under 28 U.S.C. § 1391(b).

## III.    Procedural and Factual Background

Plaintiff began employment with Rite Aid in June 2007, and initially worked as a part-time cashier. (ECF Nos. 30 at 1; 35 at 1). Her work schedule at that time was four days per week, six hours per day. (ECF Nos. 30 at 1; 35 at 1). Susan Covert ("Susan") was the manager of the store where Plaintiff worked, and was primarily responsible for setting the store schedule, as well as hiring, evaluating, disciplining, and firing store employees. (ECF Nos. 30 at 2; 35 at 1 – 2). Plaintiff was never disciplined by Susan. (ECF Nos. 30 at 1; 35 at 1). The remaining employees at Plaintiff's store consisted of associates and shift supervisors. (ECF Nos. 30 at 2; 35 at 1 – 2). Plaintiff was briefly employed as a shift supervisor before deciding to return to the position of cashier. (ECF Nos. 30 at 2; 35 at 2). The shift supervisors overseeing Plaintiff's store during her term of employment were Jacquelyn Mortimore ("Jacquelyn") and Penny Beegle ("Penny") – Jacquelyn being the more senior employee. (ECF Nos. 35 at 13; 40 at 2). Jacquelyn was also the only employee, other than Susan, to have full-time status and receive benefits. (ECF Nos. 35 at 13; 40 at 2).

While employed by Rite Aid, Plaintiff suffered physical limitations stemming from fibromyalgia, herniated discs in her neck, and irregular heartbeat. (ECF Nos. 30 at 1, 10; 35 at 1, 11). In 2009, Plaintiff's primary care physician advised Plaintiff that she should restrict her work schedule to no more than four hours per day, three days per week because of her fibromyalgia. (ECF Nos. 30 at 1; 35 at 1). Plaintiff was also to avoid lifting more than ten pounds. (ECF Nos. 30 at 10; 35 at 11). Following receipt of a physician's note, Rite Aid attempted to accommodate Plaintiff's limitations. (ECF Nos. 30 at 1; 35 at 1). Plaintiff's work schedule was altered, and on those occasions when Plaintiff informed her manager that she was

2

unable to complete tasks due to difficulty using her hands or lifting, another store associate would be directed to step in for Plaintiff. (ECF Nos. 30 at 10; 35 at 12). Plaintiff never provided Rite Aid with a physician's note regarding additional limitations. (ECF Nos. 30 at 10; 35 at 12).

Also while Plaintiff was employed by Rite Aid, Jacquelyn's husband, Alan, would visit Plaintiff's store during Jacquelyn's shifts. (ECF Nos. 30 at 5; 35 at 5). Plaintiff frequently complained to both Jacquelyn and Penny regarding Alan's inappropriate conduct towards her when he was present at the store. (ECF Nos. 30 at 5; 35 at 5). Plaintiff's complaints included allegations of sexually suggestive language and gestures directed at Plaintiff, and, eventually, the nonconsensual touching of Plaintiff's buttocks, ribcage, and breast. (ECF Nos. 30 at 5 – 6, 11; 35 at 5 – 6, 12, 16; 40 at 6). There is no indication that either Jacquelyn or Penny addressed or reported Plaintiff's complaints.

Rite Aid maintains a "no-tolerance" policy with respect to gender or disability-based harassment and discrimination in the workplace. (ECF Nos. 30 at 3; 35 at 2 – 3; 31-3 at 20 – 22). This policy covers harassment by supervisors, co-workers, and customers. (ECF Nos. 30 at 3; 35 at 2 – 3; 31-3 at 23 – 25). Rite Aid's "Anti-Harassment Policy" provides procedures for reporting harassment and discriminatory behavior via several avenues, including anonymous complaints. (ECF Nos. 30 at 3; 35 at 2 – 3; 31-3 at 23 – 25). Plaintiff participated in Rite Aid's computer-based training on harassment in September 2009, as well as training regarding anti-discrimination policies at Rite Aid. (ECF Nos. 30 at 4; 35 at 4).

Plaintiff never contacted Rite Aid's human resources department to lodge complaints about Alan's conduct. (ECF Nos. 30 at 4, 6 – 7; 35 at 4, 6 – 7). Plaintiff did not know the name of, or contact information for, her local human resources representative. (ECF Nos. 35 at 14; 40

3

at 3). Nor did Plaintiff utilize the Rite Aid employee hotline. (ECF Nos. 30 at 6; 35 at 7). Due to differing schedules, Plaintiff had limited in-person contact with Susan while at work, and she did not have or use Susan's telephone number or email address. (ECF Nos. 35 at 13; 40 at 2 – 3). Plaintiff did not make any direct complaints to Susan regarding Alan's behavior, even during performance reviews. (ECF Nos. 30 at 6; 35 at 8). Plaintiff believed that Jacquelyn and Penny should have reported her complaints to Susan. (ECF Nos. 30 at 4; 35 at 5).

On August 2, 2012, following an instance where Plaintiff claimed she was inappropriately touched on the buttocks and breast by Alan, Plaintiff informed Jacquelyn that she would not allow Alan to touch her again. (ECF Nos. 35 at 17; 40 at 8). Jacquelyn's only response was, "I thought you were over that." (ECF Nos. 35 at 17; 40 at 8). Immediately thereafter, Plaintiff wrote a letter to Susan regarding Alan, and, on August 3, 2012, Susan received that letter. (ECF Nos. 30 at 6, 8; 35 at 7, 9, 17; 40 at 8). Penny initialed the bottom of the letter before Plaintiff submitted it. (ECF Nos. 35 at 17; 40 at 8).

Upon receipt of the letter, Susan informed her general manager about the matter, and he in turn contacted Regional Human Resources Manager, Joshua Buckley ("Joshua"). (ECF Nos. 30 at 8; 35 at 9). Plaintiff continued to work at the store, as scheduled, on August 4 and 5, 2012. (ECF Nos. 35 at 18; 40 at 8). On August 7, 2012, during Plaintiff's time-off, Penny contacted her by telephone to inform Plaintiff that Alan was still visiting the store. (ECF Nos. 35 at 18; 40 at 9). Consequently, Plaintiff mailed a letter of resignation to Susan that same day. (ECF Nos. 30 at 8; 35 at 9). Susan received the letter on August 9, 2012. (ECF Nos. 35 at 18; 40 at 9).

On August 8, 2012, Plaintiff filed a criminal complaint against Alan. (ECF Nos. 35 at 19; 40 at 9). Alan was found guilty of harassment on November 15, 2012. (ECF Nos. 35 at 19; 40 at

4

10). Subsequently, Plaintiff executed a charge against Rite Aid with the Equal Employment Opportunity Commission ("EEOC") on January 23, 2013. (ECF No. 5 at 2). Plaintiff received a Notice of Right to Sue letter from the EEOC on July 18, 2013. (ECF No. 5 at 2).

Plaintiff proceeded to file a complaint in this Court against Rite Aid on October 11, 2013. (ECF No. 1). Plaintiff then filed an amended complaint on October 29, 2013, alleging that Defendants violated Title VII and the ADA and constructively discharged Plaintiff due to gender and physical disabilities. (ECF No. 5). Defendants filed an answer on December 30, 2013. (ECF No. 7). Following the close of discovery, Defendants filed the present motion for summary judgment on October 29, 2014. (ECF No. 28). Plaintiff filed a response in opposition on January 23, 2015. (ECF No. 34). The matter has been fully briefed (ECF Nos. 29, 30, 31, 35, 36, 39, 40, 41), and is ripe for disposition.

## IV.    Standard of Review

A grant of summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Heffernan v. City of Paterson*, 777 F. 3d 147, 151 (3d Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). A genuine issue of material fact is one that could affect the outcome of litigation. *Mahoney v. McDonnell*, -- F. App'x --, 2015 WL 3875741 at *3 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine issues. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue, in rebuttal. *Id.* (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587). When considering the parties' arguments, the Court is required to view all facts and draw all inferences in the light most favorable to the non-moving party. *Id.* (citing *Armbruster v. Unisys Corp.*, 32 F. 3d 768, 777 (3d Cir. 1994)). Further, the benefit of the doubt will be given to allegations of the non-moving party when in conflict with the moving party's claims. *Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 141 n. 4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs.*, 44 F. 3d 195, 200 (3d Cir. 1995)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *Id.* (citing *Williams v. Borough of West Chester*, 891 F. 2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, depositions, admissions, and/or interrogatories to demonstrate the existence of a genuine issue. *Connection Training Serv. v. City of Philadelphia*, 358 F. App'x 315, 318 (3d Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 324).

**V.    Discussion**

In its motion for summary judgment, Defendant asserts that it is entitled to judgment as a matter of law, because Plaintiff has failed to make a prima facie showing of gender-based discrimination, a gender-based hostile work environment, or constructive discharge pursuant to Title VII, as well as disability-based discrimination, a disability-based hostile work environment, constructive discharge, or a failure to accommodate pursuant to the ADA. (ECF

6

Nos. 28; 29 at 3 – 25).  In her Memorandum of Law in Opposition, Plaintiff only argues that she adduced sufficient evidence to make out prima facie cases of a gender-based hostile work environment, constructive discharge, and a failure to accommodate.  (ECF No. 34 at 1, 4 – 24).  As such, only those causes of action will be addressed by this Court, below.  To the extent Plaintiff intended her Amended Complaint to state the additional claims addressed by Defendant in its Motion for Summary Judgement, this Court will grant summary judgment for Defendant.

### A. Title VII Claims

Under Title VII, an employer cannot "discharge . . . or . . . discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment because of such individual's . . . sex." *Huston v. Proctor & Gamble Paper Prod. Corp.*, 568 F. 3d 100, 104 (3d Cir. 2009) (quoting 42 U.S.C. § 2000e-2(a)(1)).  Presently, Plaintiff claims that Alan's behavior at her place of employment created a hostile work environment, based on her gender, in violation of Title VII.  In order for Plaintiff to make a prima facie showing of a hostile work environment, she must prove "(1) she suffered intentional discrimination because of her sex, (2) the discrimination was pervasive and regular, (3) the discrimination detrimentally affected her, (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position, and (5) the existence of respondeat superior liability." *Martinez v. Rapidigm, Inc.*, 290 F. App'x 521, 524 (3d Cir. 2008) (quoting *Weston v. Pennsylvania*, 251 F. 3d 420, 426 (3d Cir. 2001)). In its Motion for Summary Judgment, Defendant takes issue primarily with Plaintiff's ability to meet the second and fifth prongs of the above test.

7

With respect to the second prong, the Court must determine whether the totality of the circumstances indicates that the alleged harassment by Alan was "sufficiently severe or pervasive." *Martinez*, 290 F. App'x at 524. In making this determination, the Court must look to the frequency of the alleged conduct, the severity of the conduct, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with work performance, or whether the conduct amounted to nothing more than mere offensive utterances. *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "The threshold for pervasiveness and regularity of discriminatory conduct is high." *Greer v. Mondelez Global, Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014). The work environment must have been so permeated with discriminatory conduct that it objectively altered Plaintiff's conditions of employment and created an "abusive working environment." *Id.* at 173 – 74 (citing *Clark County School Dist. v. Breeden*, 532 U.S. 268, 270 (2001); *Saxe v. State College Area School Dist.*, 240 F. 3d 200, 205 (3d Cir. 2001)).

In her deposition testimony, Plaintiff detailed numerous accounts of sexually-charged behaviors directed at her by Alan, beginning in December 2007. (ECF No. 31-2 at 6). Examples included the following:

- On one occasion, while Plaintiff was eating a donut, Alan stated, "I have some cream for your donut." (ECF No. 36-1 at 30).

- On one occasion, Alan stated to Plaintiff in the presence of Jacquelyn that, "I want [Plaintiff] to be my whore." (ECF No. 36-2 at 3).

- Alan would often grab his crotch and say to Plaintiff that he "had more than [Plaintiff] could handle." (ECF No. 36-1 at 33).

8

- Alan would frequently wait outside the restroom door when Plaintiff was inside. (ECF No. 36-2 at 8).

- Alan would frequently obstruct Plaintiff's path and hold out his arms in an effort to touch her. (ECF No. 36-2 at 11).

- Alan would frequently sneak up behind Plaintiff and poke her ribs to "scare" her. (ECF No. 36-2 at 7 – 8).

- Alan forcefully slapped Plaintiff's buttocks on two occasions, once in February 2012, and a second time just before Plaintiff sent her August 2, 2012 letter to Susan. (ECF No. 36-2 at 7, 13 – 14). Plaintiff said it felt like Alan hit her, "as hard as he could." (ECF No. 36-2 at 22).

- Also just prior to sending the August 2, 2012 letter, Alan pressed his finger into Plaintiff's breast, held it there, and then swiped it across her chest before she had a chance to push his hand away. (ECF No. 36-2 at 23 – 24).

Plaintiff frequently asked Alan to cease this behavior, but to no avail. (ECF No. 36-1 at 34).

Rite Aid contends that over Plaintiff's five year term of employment Alan only behaved inappropriately on approximately ten occasions; yet, viewing Plaintiff's testimony in the light most favorable to her as the non-moving party, the circumstances skew significantly in Plaintiff's favor. Plaintiff clearly stated that her difficulty identifying discrete instances of harassment stemmed not from the infrequency of Alan's behavior, but exactly the opposite – Alan directed his untoward conduct at Plaintiff with increasing frequency and aggressiveness over time, eventually graduating from innuendo to physical contact (ECF No. 31-2 at 6).

If Plaintiff's statements are true, as this Court must assume at the summary judgment stage, Alan's conduct towards Plaintiff was more than "impolite and childish," as Rite Aid attempts to characterize it. (ECF No. 29 at 15). Moreover, Penny considered Alan's physical contact with Plaintiff to be inappropriate, and Penny noted Plaintiff's discomfort around him. (ECF No. 36-2 at 13 – 14). Penny testified that her observations of Alan's behavior led her to believe he was obsessed with Plaintiff. (ECF No. 36-3 at 11 – 13). Such testimony only lends support to Plaintiff's claims. Additionally, even if Alan's conduct were as infrequent as Rite Aid contends, it has been held that isolated instances of sexually-charged conduct, if sufficiently severe, can satisfy the second prong. *Caver v. City of Trenton*, 420 F. 3d 243, 262 (3d Cir. 2006) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Rite Aid advances no reasoning as to why the forceful hitting of Plaintiff's buttocks and groping of her breast cannot be considered sufficiently severe. With this in mind, and given the questions of credibility raised by numerous conflicting accounts among the parties involved in the present case, the Court finds that Plaintiff has met her burden with respect to the second prong.

Rite Aid next attacks Plaintiff's ability to demonstrate the existence of respondeat superior liability under the fifth prong. It has been held that respondeat superior liability may exist if an employer does not provide employees with a process for lodging complaints, or if the employer knew or should have been aware of harassment and did not take prompt and/or appropriate action. *Huston*, 568 F. 3d at 104 (citing *Kunin v. Sears Roebuck & Co.*, 175 F. 3d 289, 293 (3d Cir. 1999)). Constructive notice may be imputed to an employer when either "an employee provides management level personnel with enough information to raise a probability of sexual harassment in the mind of a reasonable employer," or harassment is "so pervasive and

10

open that a reasonable employer would have had to be aware of it." *Id.* at 105 (citing *Kunin*, 175 F. 3d at 294).

As to whether such liability may be found where harassment was directed at an employee by a non-employee, the Court of Appeals for the Third Circuit has not definitively spoken. However, a number of district courts in this circuit, as well as other circuit courts of appeal, have determined that, consistent with EEOC guideline 29 C.F.R. § 1604.11(d-e), an employer may be responsible for the acts of non-employees where there was constructive knowledge on the part of the employer. *Guthrie v. Baker*, 583 F. Supp. 2d 668, 678 (W.D. Pa. 2008); *Mongelli v. Red Clay Consol. School Dist. Bd. of Educ.*, 491 F. Supp. 2d 467, 477 (D. Del. 2007); *Graves v. County of Dauphin*, 98 F. Supp. 2d 613, 620 (M.D. Pa. 2000). Nevertheless, in coming to a conclusion regarding respondeat superior liability, the Court must be mindful that "not all facts known by an agent are imputed to the principal." *Huston*, 568 F. 3d at 106 (citing Restatement (Third) of Agency § 5.03 (2006)). What an employer knows by way of its agents depends upon the agent's duties to the employer. *Id.* at 107.

In the present case, there is no question that Rite Aid provided its employees with several avenues for lodging complaints about discrimination. Therefore, Plaintiff argues that Rite Aid had at least constructive notice of Alan's sexually harassing conduct. She claims that not only did Susan and Joshua have direct notice after August 3, 2012, but that shift supervisors Jacquelyn and Penny had witnessed Alan's behavior and received direct complaints from Plaintiff over the course of several years. (ECF No. 31-2 at 4 – 5, 11 – 12, 15 – 19, 30). While it is not disputed that Susan and Joshua were 'management' for purposes of respondeat superior

11

liability, Rite Aid argues that Jacquelyn and Penny were not 'management,' and their knowledge cannot properly be imputed to Rite Aid.

This Court finds that although the question of what Jacquelyn and Penny saw or learned from Plaintiff is disputed in the parties' testimony, Plaintiff has provided sufficient evidence to create an issue of credibility not amenable to disposition at summary judgment. However, as to Jacquelyn and Penny's status as 'management,' the analysis is more complicated. In making the determination as to what individuals may qualify as 'management,' the Court of Appeals for the Third Circuit looks to whether the individual is "an employee in the governing body of an entity, as opposed to merely a supervisory employee in the labor force." *Huston*, 568 F. 3d at 108. "[T]o the extent that…a supervisor does not have a mandate generally to regulate the workplace environment, that supervisor does not qualify as management level." *Id.* The "most obvious supervisory powers include the power 'to hire and fire, and to set work schedules and pay rates.'" *Valenti v. Triangle Circuits of Pittsburgh, Inc.*, 419 F. Supp. 2d 701, 707 (W.D. Pa 2005) (quoting *Sofia v. McWilliams*, 2003 WL 1818414 at *8 (E.D. Pa. 2003)). However, complete authority is not required. *Durham v. Life Ins. Co. v. Evans*, 166 F. 3d 139, 154 – 55 (3d Cir. 1999). Determining whether an individual has sufficient supervisory power is a fact-intensive inquiry principally hinging upon whether an employee is sufficiently senior that knowledge of discrimination is important to his or her managerial duties. *Huston*, 568 F. 3d at 107. The Court must distinguish employees "who are supervisors merely as a function of nomenclature from those who are entrusted with actual supervisory powers." *Griffin v. Harrisburg Property Serv., Inc.*, 421 F. App'x 204, 208 (3d Cir. 2011) (quoting *Parkins v. Civil Constructors*, 163 F. 3d 1027, 1033 (7th Cir. 1998)).

12

Plaintiff asserts – having been trained to be a shift supervisor, herself – that it is a shift supervisor's job to monitor the store and take care of problems that arise. (ECF Nos. 36-1 at 27; 36-2 at 16). She testified that shift supervisors could discipline employees. (ECF Nos. 36-1 at 5; 36-2 at 16). Plaintiff further testified that while training to become a shift supervisor, Susan explained to Plaintiff that she should contact Susan whenever she encountered an issue she could not handle. (ECF Nos. 36-1 at 5; 36-2 at 16). While Rite Aid argues that this testimony is not accurate, several pieces of evidence appear to bolster Plaintiff's contentions.

The Court notes that Rite Aid's official job description for 'Shift Supervisor' indicates that the position entails "managing tasks and supervising store associates...when the Store Manager and/or Assistant Store Manager is unavailable." (ECF No. 36-8 at 2). Records indicated that Susan was rarely scheduled to work at the same time as Plaintiff, leaving Jacquelyn and Penny as Plaintiff's immediate supervisors. (ECF Nos. 36-9; 36-10). Additionally, the shift supervisor job description requires assistance with "ensuring a *safe* and pleasing environment for both customers *and associates*." (ECF No. 36-8 at 2) (emphasis added). While the position description explicitly excluded hiring, firing, or disciplining associates, Penny testified that she had witnessed Jacquelyn send an employee home in the past. (ECF No. ECF No. 31-4 at 3 – 4). Jacquelyn was also listed as "store management" in a report relevant to Plaintiff's harassment complaints. (ECF No. 36-13 at 2). In fact, Jacquelyn testified that it was her responsibility to report claims of harassment in the workplace to Susan. (ECF No. 36-4 at 8). Additionally, Plaintiff testified that Jacquelyn frequently witnessed Alan's conduct, and often admonished him to stop. (ECF No. 31-2 at 11 – 12).

13

Viewing the above facts in the light most favorable to the non-moving party, it appears that Jacquelyn – and possibly even Penny – had actual supervisory authority in Susan's absence. Handling issues with customers such as Alan would certainly appear to fall within the "Essential Duties and Responsibilities" of a shift supervisor to assist with ensuring a safe environment for both customers *and associates*. (ECF No. 36-8 at 2). In light of the above, the Court cannot say that knowledge of sexual harassment of associates by non-employees in the store would not be important to Jacquelyn and Penny's duties in Susan's absence. *Huston*, 568 F. 3d at 107.

Having determined that Plaintiff advanced sufficient evidence that Jacquelyn and Penny could be considered managers for purposes of finding respondeat superior liability, the Court must now determine whether the actions of Jacquelyn, Penny, Susan, and Joshua were adequate following their discovery of Plaintiff's complaints of sexual harassment. It has been established that any remedial action taken by an employer in response to complaints of discrimination will be considered legally adequate when found to be "reasonably calculated to prevent further harassment." *Huston*, 568 F. 3d at 110 (quoting *Knabe v. Boury Corp.*, 114 F. 3d 407, 412 n. 8 (3d Cir. 1997)). However, this should not be taken to mean that an employer's *investigation* into discriminatory activity must be perfect – or even adequate. *Knabe*, 114 F. 3d at 412. Further, "even if a remedial action does not effectively end the alleged harassment, it may still be legally 'adequate' if it was 'reasonably calculated to do so." *Peace-Wickham v. Walls*, 409 F. App'x 512, 519 (3d Cir. 2010) (citing *Jensen v. Potter*, 435 F. 3d 444, 453 (3d Cir. 2006)).

With respect to the actions of Jacquelyn and Penny following Plaintiff's complaints of harassment by Alan, the Court cannot find any evidence of a reasonable attempt to take

14

remedial action. While Jacquelyn occasionally admonished Alan regarding his behavior, it did not put an end to his harassment of Plaintiff. Penny made no attempts to address Plaintiff's complaints until informed by Plaintiff that Alan had touched her buttocks and breast, several years after the harassment had originally begun. (ECF Nos. 36-2 at 27; 36-3 at 14 – 15).

With respect to the actions of Susan and Joshua, the issue is a closer one. In a statement written by Susan on August 6, 2012 to aid Joshua in investigating Plaintiff's complaints against Alan, Susan stated that she learned of Plaintiff's complaints of inappropriate physical contact by Alan from Jacquelyn at an August 2, 2012 church function. (ECF No. 36-14 at 2). Penny also called Susan that day to relay similar information. (ECF No. 36-14 at 3). Susan claims to have instructed Jacquelyn to keep Alan out of the store until the allegations could be investigated. (ECF No. 36-14 at 2 – 3). The next day, August 3, 2012, Susan found a note from Plaintiff when she arrived at work. (ECF No. 36-14 at 4). Susan claims to have immediately forwarded the complaint to her general manager, who then contacted Joshua. (ECF No. 36-14 at 4). There is no indication that Susan ever tried to contact Plaintiff directly. Plaintiff alleges that she saw Susan in the parking lot after she sent her August 2, 2012 letter, but Susan made no effort to speak to her. (ECF No. 31-2 at 29 – 30). In addition, contrary to what Susan reported, Jacquelyn testified that she first informed Susan of Plaintiff's complaints around July 22, 2012. (ECF No. 36-4 at 13).

Joshua began the actual investigation of Plaintiff's claims, interviewing Jacquelyn on August 3, 2012. (ECF No. 31-5 at 15). Joshua testified that he banned Alan from the store that same day. (ECF No. 31-5 at 13). He also ordered that Plaintiff and Jacquelyn were not to work

15

together until the investigation was completed. (ECF No. 31-5 at 13). However, he did not contact Plaintiff.

On August 9, 2012, Susan received a letter of resignation from Plaintiff. (ECF No. 31-5 at 16). She informed Joshua, who in turn made his first attempt to contact Plaintiff about her complaints. (ECF No. 31-5 at 16 – 18). Joshua was never able to speak with Plaintiff. (ECF No. 31-5 at 16 – 18). Plaintiff submitted her resignation after receiving a phone call from Penny stating that Alan was still coming into the store. (ECF Nos. 31-2 at 37; 36-3 at 19). Penny testified that she was never informed that Alan was banned from the store, and had witnessed him continuing to enter after Plaintiff's first letter had been received by Susan. (ECF No. 36-3 at 18 – 19).

Viewing these facts in the light most favorable to Plaintiff, the Court finds that a reasonably jury could conclude that Jacquelyn, Penny, Susan, and Joshua failed to address the situation regarding Alan's behavior in an effective manner once they learned of Plaintiff's complaints. While there are starkly contrasting accounts of the efforts Plaintiff made to resolve her issues with Alan, the Court finds that she has met the requirement of making a prima facie showing of respondeat superior liability under the fifth prong of the hostile work environment test.

Nevertheless, this does not necessarily answer whether the above circumstances are sufficient to constitute constructive discharge, as claimed by Plaintiff. Courts have held that "an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." *Hill v. Kutztown*, 455 F. 3d 225, 233 n. 7 (quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004)). Thus, a claimant may

16

argue constructive discharge when an employer was, or should have been, aware of harassment and did nothing to stop it. *Duffy v. Paper Magic Group, Inc.*, 265 F. 3d 163, 168 (3d Cir. 2001) (quoting *Aman v. Cort Furniture Rental Corp.*, 85 F. 3d 1074, 1084 – 85 (3d Cir. 1996)). The relevant test is whether "a reasonable jury could find that the employer permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign. *Colwell v. Rite Aid Corp.*, 602 F. 3d 495, 502 (3d Cir. 2010) (quoting *Duffy*, 265 F. 3d at 167). Factors frequently considered in making the above determination include: threats of termination or suggested resignation, demotions, reductions in pay and benefits, transfer to less desirable positions, and alteration of job responsibilities, and/or poor performance evaluations. *Id.* at 503 (quoting *Clowes v. Allegheny Valley Hosp.*, 991 F. 2d 1159, 1161 (3d Cir. 1993)). Moreover, "[t]o make out a constructive discharge claim, a plaintiff must show greater severity or pervasiveness than the minimum required to prove a hostile working environment." *Greer*, 590 F. App'x at 175 n. 7 (citing *Spencer v. Wal-Mart Stores, Inc.*, 469 F. 3d 311, 317 n. 4 (3d Cir. 2006)).

Without reviewing the above facts at length, the Court finds that Plaintiff adduced sufficient evidence to demonstrate a prima face case of constructive discharge. While Plaintiff resigned only five days after submitting her first letter to Susan, if indeed Plaintiff had been reporting her harassment by Alan consistently to her shift supervisors over the years, and Susan knew of her complaints as early as July 22, 2012, then Plaintiff's decision to quit after hearing the Alan was still coming to the store does not appear to be unreasonable. As clearly recited in Plaintiff's August 7, 2012 resignation, Rite Aid did not contact Plaintiff about her complaints, and five days after submitting her complaint to Susan, Penny informed her that Alan was still visiting the store. (ECF No. 36-12). The increasing severity of Alan's sexual conduct, and the

failure to address the matter effectively by various levels of managerial personnel, left Plaintiff with the impression that she would not receive aid and that she needed to remove herself from the work environment for her own well-being. (ECF No. 36-12).

Drawing all inferences in favor of Plaintiff, it appears that reporting the forceful hitting of Plaintiff's buttocks and the groping of her breast, in addition to other sexual harassment, was not sufficient to get Alan banned from the store and/or even an acknowledgment from managerial personnel. Although Rite Aid argues that Plaintiff should have availed herself of other available means of complaint before quitting, *see Brooks v. CBS Radio, Inc.*, 342 F. App'x 771, 778 (3d Cir. 2009) ("a reasonable employee will usually explore...alternative avenues"), Jacquelyn and Penny's failure to address several years of harassment complaints, the lack of contact by Rite Aid almost a full week after her first written letter, and a report by shift supervisor Penny that Plaintiff's harasser was still entering the store, was not likely to instill faith in Rite Aid's process of dealing with sexual harassment claims. As such, this Court finds that Plaintiff has adduced sufficient evidence to demonstrate that the decision to leave her employment was objectively reasonable, to withstand a grant of summary judgment.

### B. ADA Claims

Under the ADA, "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to...the terms, conditions, and privileges of employment." *Walton v. Mental Health Ass'n of Southeastern Pennsylvania*, 168 F. 3d 661, 666 (3d Cir. 1999) (quoting 42 U.S.C. § 12112(a)). Presently, Plaintiff claims that despite her requests for accommodation for fibromyalgia and irregular heartbeat, and despite

having direct knowledge of these conditions, Rite Aid failed to provide reasonable accommodations for her physical limitations. As with her Title VII claim, Plaintiff also argues that she was constructively discharged. Defendant counters that the record clearly shows that all accommodations requested for medically documented disabilities were granted, and that to the extent Plaintiff believed she had additional limitations that were not accommodated, it was due to Plaintiff's failure to communicate with Rite Aid.

Demonstrating a prima facie case of discrimination under the ADA requires a claimant to show that he or she is qualified for the essential functions of a job, and can perform said functions with or without reasonable accommodation. *Colwell v. Rite Aid Corp.*, 602 F. 3d 495, 504 (3d Cir. 2010) (citing *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F. 3d 751, 761 (3d Cir. 2004)). Failing or refusing to provide a reasonable accommodation for a disability can constitute an adverse employment decision. *Id.* Proving such a failure requires a claimant to show that "1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Id.* (quoting *Williams*, 380 F. 3d at 772).

Defendant does not argue that Plaintiff was not disabled within the meaning of the ADA, instead arguing for summary judgment based upon its provision of all requested accommodations for Plaintiff's fibromyalgia, as well as Plaintiff's failure to inform Rite Aid of limitations stemming from her heart condition. Plaintiff first claims that her fibromyalgia was not accommodated as agreed upon with respect to lifting more than ten pounds. Following

receipt of her primary care physician's note indicating that Plaintiff could not lift more than ten pounds, Susan told Plaintiff that she "wasn't allowed to do truck." (ECF No. 36-1 at 12). According to Plaintiff, to "do truck" meant helping stock store aisles after items had been unloaded from the delivery truck. (ECF No. 36-1 at 13). Although not specified, this task could presumably involve lifting more than ten pounds.

However, Plaintiff has not presented any evidence that she *needed* to be exempted from all work related to "do truck," even if Susan originally told her she would not be required to help. In fact, Plaintiff testified that she was unaware of the exact contents of her physician's note and the exact limitations provided therein. (ECF No. 36-1 at 11 – 12). Additionally, Plaintiff also testified that "a lot of times the truck was already done when I got in [work], but sometimes it wasn't." (ECF No. 36-1 at 11). Further, Plaintiff's own testimony indicates that when she asked for assistance due to the weight of items to be stocked, she was always provided with relief. (ECF Nos. 31-1 at 35; 36-1 at 13 – 15). Plaintiff testified that she stopped receiving help when she ceased to ask for it; she felt she should not have had to ask for help every time the delivery truck unloaded the store inventory. (ECF No. 36-1 at 15).

Yet, the evidence shows that Plaintiff was not exempted from all lifting by her limitations, and Plaintiff provides no rationale for her conclusion that it is unreasonable to ask for help each time she discovers that she cannot handle lifting a certain item. In light of the evidence showing that Plaintiff received help lifting when asked, and that Plaintiff was only sometimes involved with moving inventory to the store shelves to begin with, the Court finds that Plaintiff has not established a prima facie case of failure to accommodate her lifting restrictions.

20

Plaintiff next argues that Alan's attempts to scare her exacerbated her irregular heartbeat, and that her supervisors' failure to address the situation constituted a failure to accommodate. Plaintiff believed that Rite Aid was fully apprised of her medical needs because on one occasion she was taken by ambulance from her place of employment to the hospital for difficulty breathing. (ECF No. 36-2 at 35). Yet, Plaintiff never provided medical information or a physician's note to Rite Aid regarding her heart condition or limitations stemming therefrom. (ECF No. 36-2 at 36). Plaintiff testified that Alan's attempts the scare her made her heartbeat accelerate, but she never informed her doctor. (ECF No. 36-2 at 38). Plaintiff testified that she never requested a specific accommodation for her heart. (ECF No. 36-2 at 36). She only informed her co-workers that she was admitted to the hospital because of an irregular heartbeat, and was prescribed aspirin. (ECF No. 36-2 at 36). Penny testified that she was aware of Plaintiff's heart condition, and that Plaintiff had remarked that she thought Alan was going to give her a heart attack. (ECF No. 36-3 at 9 – 10). Penny thought it was a joke. (ECF No. 36-3 at 10). In light of the above, while Plaintiff may have legitimate limitations related to her heart condition which require accommodation, the evidence provided by Plaintiff demonstrate that she did not communicate her heart issues to her employer, and she did not ask for accommodation. As such, Plaintiff has not satisfied her burden with respect to making a prima face case of failure to accommodate.

Finally, to the extent that Plaintiff attempts to argue that she was constructively discharged due to her disabilities, this Court finds no evidence to support such a contention. Similarly, to the extent that Plaintiff's Amended Complaint attempts to establish claims for gender-based discrimination, generally, as well as disability-based discrimination or a

21

disability-based hostile work environment, this Court finds no evidence to support such claims, as Plaintiff did not respond to arguments regarding these causes of action in Defendant's motion to dismiss.

## VI.    Conclusion

Based upon the foregoing, Plaintiff provided sufficient evidence, when viewed in the light most favorable to her as the non-moving party, to allow the court to determine that she established a prima facie case for hostile work environment and constructive discharge under Title VII. However, Plaintiff has failed to advance sufficient evidence to establish prima facie cases for her remaining claims. Accordingly, Defendant's motion for summary judgment is **DENIED** as to Plaintiff's Title VII claims for hostile work environment and constructive discharge, and **GRANTED** as to Plaintiff's remaining claims.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CATHY SHATZER, | ) | Civil Case No. 13-233 |
| | ) | |
| Plaintiff, | ) | Judge Kim R. Gibson |
| | ) | |
| v. | ) | |
| | ) | |
| RITE AID CORPORATION and RITE | ) | |
| AID OF PENNSYLVANIA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

**AND NOW**, this 14th day of August, 2015, upon consideration of Defendants' motion for summary judgment (ECF No. 28) and for the reasons stated in the foregoing memorandum opinion, **IT IS HEREBY ORDERED** that Defendants' motion for summary judgment is **DENIED** as to Plaintiff's Title VII claims for hostile work environment and constructive discharge and **GRANTED** as to Plaintiff's remaining claims.

BY THE COURT:

KIM R. GIBSON
UNITED STATES DISTRICT JUDGE